# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| E.P., by and through his parents, | : | CIVIL ACTION |
| ALLISON H.-P. and MICHAEL P., | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | No. 20-2078 |
| TWIN VALLEY SCHOOL DISTRICT, | : | |
| Defendant. | : | |

### MEMORANDUM OPINION

**TIMOTHY R. RICE**                                         **FEBRUARY 3, 2021**
**U.S. MAGISTRATE JUDGE**

An Administrative Hearing Officer found Defendant Twin Valley School District (Twin Valley) failed to provide a free appropriate public education (FAPE) to Plaintiff E.P. for the school years 2014-19, in violation of Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. §794. He ordered Twin Valley to pay the costs of multiple private evaluations and for compensatory education in an amount determined by an independent evaluator, whose fee would also be paid by the school district. Hearing Officer Opinion (H.O. Op.) at 57-59. Twin Valley now contends that the Hearing Officer misapplied Section 504. Pl. Br. (doc. 11-1) at 1. Even assuming a Section 504 violation, it also claims that E.P.'s claim was barred by the statute of the limitations. Id. at 12. As explained below, I will affirm.

For the most part, the parties agree what actions were taken when. H.O. Op. at 27 ("their testimony was essentially consistent with respect to the actions taken or not taken by the District or the Parents in evaluating the Student's Section 504 eligibility"). The parties dispute whether the behavior about which E.P.'s parents consistently complained warranted school-based accommodations even though E.P. was able to perform at grade level without them.

The facts are complicated partly because of E.P.'s profile, which includes neurological

issues related to in utero exposure to crack cocaine; social issues related to inter-racial adoption, the deaths of family members, and his parents' separation over the time period at issue; and gifted cognitive abilities which may have masked the effects of his limitations at school. Moreover, the disparity between the school's description of E.P.'s functioning and the parents' description of E.P.'s functioning is so enormous that they seem to be describing different children.  See, e.g., S13 at 17 (classroom and music teacher's behavior ratings would require no interventions while mother's ratings would diagnose autism).

The Hearing Officer concluded that the independent educational evaluation (IEE), which was provided by Twin Valley after years of repeated requests, focused exclusively on eligibility under the Individuals with Disabilities Education Act, (IDEA), 20 U.S.C. § 1400, et seq. "either by design or error."  Id. at 29.  He determined that, by ignoring the school district's independent and broader obligations under Section 504, it failed to provide FAPE at least as early as first grade, when E.P.'s "first grade teacher raised the concern about the 'pushy' mother," which caused "the social worker, who suggested an evaluation," to "back[] off."  H.O. Op. at 49.  He concluded that this teacher "guided the team away from the individualized assessment path" required under Section 504.  Id. at 50.  As described below, his conclusions are amply supported in his 59-page Opinion by the administrative record.

**STANDARD OF REVIEW**

The parties dispute the applicable Standard of Review.  District Courts in this Circuit are split on which standard of review applies to stand-alone Section 504 cases.  T.F. v. Fox Chapel Area Sch. Dist., 589 F. App'x 594, 598 (3d Cir. 2014) (finding it unnecessary to determine standard of review).  The school district argues that administrative decisions based on independent Section 504 claims are subject to "de novo" review, Pl. Br. at 6-7, while E.P. argues

the United States Court of Appeals for the Third Circuit Court will likely find them subject to the same "modified de novo" review as Section 504 cases that also include an IDEA claim, Def. Br. at 16. In a "modified de novo" review of a Hearing Officer's decision, factual determinations are given "due weight." S.H. v. State-Operated Sch. Dist. of City of Newark, 336 F.3d 260, 269–70 (3d Cir. 2003). This means they are assumed to be prima facie correct and, when the Hearing Officer makes credibility determinations based on live testimony, they are accepted unless nontestimonial extrinsic evidence justifies a contrary conclusion. D.K. v. Abington Sch. Dist., 696 F.3d 233, 243 (3d Cir. 2012); see also M.G. v. N. Hunterdon-Voorhees Reg'l High Sch. Dist. Bd. of Educ., 778 F. App'x 107, 110 (3d Cir. 2019) (the party challenging the Hearing Officer's decision must overcome the "presumption that the Hearing Officer's findings were correct"). In contrast, a de novo review "gives no deference to the Hearing Officer's factual findings." T.F., 589 F. App'x at 598.

        As explained below, I decline to resolve this legal issue because I reach the same conclusion under both standards. And I will review conclusions of law de novo. In re Educ. Assignment of Joseph R., 318 F. App'x 113, 118 (3d Cir. 2009). "[S]tatute of limitations claims . . . are subject to plenary review as conclusions of law." P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist., 585 F.3d 727, 734 (3d Cir. 2009).

**FACTS**

        E.P. entered kindergarten in the fall of 2014. P1 at 1.  He had received school-based and outpatient occupational therapy in preschool to remediate the difficulties posed by his sensory processing disorder, eating challenges, and social and emotional developmental delay. S1 at 1; P6 at 1. His neurological condition was attributed to the pregnancy drug use of his birth mother. P8 at 4. Because these challenges affected his performance in preschool, E.P. had an

Individual Education Plan (IEP) issued pursuant to IDEA.   P6 at 1.

Just days into kindergarten, E.P.'s mother emailed his teacher, informing her of E.P.'s sensory processing disorder and asking for specific assistance with his eating disorder as a method for managing his behavior at home.  P1 at 1.  E.P.'s mother told his teacher that E.P. had a history of having severe meltdowns when he got home from school.  Id.  She asked the teacher to monitor his eating at lunch to ensure he was eating protein, and to give him an additional protein-based snack at the end of the day in an effort to better control his afternoon behavior.  Id.  That month, Twin Valley requested and E.P.'s parents granted permission to re-evaluate E.P.'s eligibility for services.  S2 at 28.

E.P.'s healthcare providers had documented "a definite difference in the areas of auditory, vestibular, touch and oral sensory processing" in March 2014, S1 at 5, and the Intermediate Unit had reported "significant development delay in the area of social and emotional development" in July 2014, P6 at 4.  Nonetheless, in September and early October 2014, his kindergarten teachers reported observing no evidence of sensory issues or other developmental delay.  S21 at 1, S-2 at 21.  Despite their observations, E.P.'s teachers gave him the opportunity to attend the "Brain Gym" several mornings per week and on Thursday afternoons, and agreed to monitor his eating during lunch and provide him an additional snack in the afternoon.  S2 at 19.

When E.P.'s official re-evaluation report was issued in December 2014, it included Behavioral Assessment System for Children (BASC) scores based on observations by his teachers and parents.  S2 at 14.  The scores were widely divergent, with E.P.'s scores based on his parents' observations qualifying him for extensive services, and his teachers' scores disqualifying him from any support.  Id.  The Report also noted that E.P.'s superior IQ score

qualified him for the gifted program.  P7 at 3.  Twin Valley concluded that E.P. did not qualify

for IDEA services because he did "not present with a school-based disability classification," but

that he did qualify for a Gifted Individual Education Plan (GIEP).  S2 at 21, 22 ("The student

does not have a disability and therefore no longer is eligible for special education").[1]  As the

Hearing Officer found, "[t]he District did not offer and the Parents did not ask for an individual

assessment to determine if the Student was otherwise eligible for Section 504 FAPE supports."

H.O. Op. at 6, ¶ 9.

Throughout the second half of kindergarten, E.P.'s mother repeatedly advised his teacher

of ongoing behavioral problems, including refusing to attend school, and to request

accommodations.  P1 at 4-5.  Nonetheless, he received excellent grades on his kindergarten

report card, including a normal record of attendance.  S18 at 1.  A June 2015 private

psychological evaluator recommended behavioral health rehabilitation services and re-evaluation

for occupational therapy based on diagnoses of intermittent explosive disorder and anxiety as

well as possible oppositional defiant disorder.  P8 at 9.

In January of his first-grade year, E.P.'s mother asked his teacher to allow E.P. to do

some of his homework in school, based on the recommendation of his therapist.  P2 at 1.  E.P.'s

teacher consulted his gifted teacher and then wrote to the principal:

> We feel this is a home issue not a school issue and are worried that we could
> create a dangerous precedence (sic).  Our solution is for him to complete the
> reading on the bus and the math at home.  If he doesn't complete the math in a
> reasonable amount of time mom could send the blank homework in the following
> day and he can complete it at recess.  We hope this will promote his
> independence.  We just asked [E.P.] and he is saying he doesn't give mom a hard
> time and is very cooperative, but his face appears different.  We shared our plan

---

[1]     Despite finding him ineligible for Occupational Therapy (OT), this theoretically
disqualifying evaluation recommended that E.P. continue to have "the opportunity to have
additional gross motor ('heavy work') activities and for school staff to monitor that [E.P.] eats
enough protein at lunch."  S2 at 21.

and [E.P.] said he likes doing homework.  I think this really confirms this is a
home issue, not a school issue.

Id.

E.P.'s mother disagreed and asked the school team to speak directly with E.P.'s post-

adoption social worker.  Id. at 3.  The school counselor was consulted, and the first-grade teacher

opined that "mom is going to keep pushing for things that we don't see here at school."  Id. at 2.

She warned that, despite "the struggles [E.P.'s mother] is facing, I am not sure we want to open

ourselves up to services such as this."  Id.  Upon being informed that E.P. already had a GIEP,

the school counselor summarized the school's considerations differently.  "Mom is saying it's a

behavioral issue affecting academics.  I would say then an IEP [meeting] should be held.  I didn't

realize that he was already identified."  Id.  No IEP meeting was held.

E.P.'s mother continued to oppose the school's plan of requiring E.P. to spend part of his

recess completing any unfinished homework.  P2 at 9-10.  When E.P.'s teacher consulted the

principal about these ongoing communications, he instructed her to tell E.P.'s mother "in the

future that it took a minute or two of his free time."  Id. at 11.  E.P.'s first-grade report card was

excellent and showed average attendance.  S-18 at 2.

That summer, E.P.'s occupational therapist continued working on his sensory, social,

emotional, and behavioral goals.  P9 at 1.  Before second grade, E.P.'s mother emailed his new

teacher to inform her of E.P.'s sensory processing disorder and anxiety, which she noted could

be verified by his post-adoption social worker.  P3 at 1.  She described his at-home meltdowns

and requested that the teacher assist E.P. by providing him with high-protein snacks.  Id. at 2.

Although second grade seemed to start well, by the end of September, E.P. was already a

"frequent flyer" at the nurse, and his teacher acknowledged this was due to his anxiety.  Id. at 3.

Later that fall, E.P.'s mother reported difficulties in math and reading, P3 at 5, and a private

psychological evaluation that December diagnosed him with autism, P11 at 4.  He began a course of psychotropic medication.  Id.  Before his second-grade GIEP meeting in December 2016, E.P.'s mother informed the school of his autism diagnosis and requested sensory breaks throughout the day and evaluation by the school psychologist.  P3 at 10.

The school psychologist did not evaluate E.P. that year.  Instead, E.P. again received excellent grades on his report card.  S-18.  He received even better scores on "learning behavior" than on reading.  Id. at 4.  His absences, however, had more than doubled and were 15.5 for the year, id. at 5, about double the norm.  N.T. 2/13/20 at 293.

The Hearing Officer concluded that, throughout second grade, E.P.'s mother "repeatedly emailed the Teacher" and made her "aware of the Student's anxiety about School" and struggles with "social interaction" and "eating."  H.O. Op. at 9 ¶ 17.  He noted that, even when E.P.'s mother refused to sign off on his GIEP that year because Twin Valley refused to include sensory breaks in his accommodations, the school district "never issued a permission to evaluate," "never gave the Parents prior written notice of the District's refusal to evaluate," and never "provide[d] the Parents with their IDEA or Section 504 procedural safeguards."  Id. at 11 ¶ 23.

In August 2017, a private neuropsychological evaluator diagnosed E.P. with Frontal Lobe and Executive Functioning Deficit, attributing it to his prenatal drug exposure.  S4 at 7-8.  The neuropsychiatrist recommended E.P. continue psychiatric medication, therapy, and participation in a social skills group, and that he also continue to receive "his IEP services from school."  Id. at 8.  The Hearing Officer observed that, "[w]hile the report recommends that the Student continue to receive IEP services, the record is clear the Student was not IDEA eligible at the time of the report."  H.O. Op. at 12 ¶ 25.  He also noted that, "[a]lthough the report was received by the Student's building team, the District did not convene a meeting to review the report, conduct an

individual assessment, or issue IDEA, Section 504, or Chapter 16 procedural safeguards agreeing to or rejecting the examiner's recommendations." Id. at ¶ 26.

Before starting third grade, E.P.'s mother again contacted his teacher and explained his condition and needs. S21 at 5. She asked that he be exempted from a specific "academic all-stars program" due to the increased anxiety it caused him and the effect on his behavior. Id. The teacher responded that "[s]tudents who are gifted often put a lot of pressure on themselves to be perfect," and offered to give him access to the school counselor instead. Id. E.P.'s mother continued to email E.P.'s teacher throughout the fall, and on October 27, 2017, wrote a letter to the elementary school principal requesting an IEP evaluation because the informal accommodations accompanying his GIEP "have been unsuccessful." Id. at 6. After receiving no response, E.P.'s mother emailed the principal a week later to confirm that he had received the request. Id. The principal confirmed he was looking into her request but it was "a new one" for him because they did not see any evidence of E.P.'s limitations at school. Id.

Over the next week, E.P.'s mother emailed the principal several times regarding harassment of E.P. on the bus. P4 at 6-12. Internal school emails show the teachers attributed the disputes to E.P.'s inappropriate social behavior. Id. Further emails between E.P.'s mother and the school show the conflict was not immediately resolved. Id. at 15-16.

In late November 2017, E.P.'s mother attended the meeting called to address her request for evaluation, although the principal and gifted teacher apparently left the meeting early and the only accommodation plan addressed was E.P.'s GIEP. S21 at 11. E.P.'s mother requested a specific list of accommodations, including exemption from the academic all-stars program, and most of her requests, including the exemption, were rejected by the team. Id. In an internal email, the principal opined that E.P.'s behaviors "legally should not have anything to do with us"

because they all take place at home.  Id. at 12.  E.P.'s gifted teacher and school counselor agreed

the accommodations were inappropriate for a GIEP, but the team concluded they would "try" a

limited number of recommendations they designed and "would/could draft a 504 Plan after the

holidays," if necessary.  Id. at 10-11.

The Hearing Officer summarized that, "[w]hile the Record is unclear as to the specifics

of what the Parties did or did not agree to, the record is clear the Parties agreed to implement a

series of regular education tiered interventions."  H.O. Op. at 14-15, ¶ 30.  "The Parties further

agreed that if there were no effect from the interventions, then further evaluations would be

warranted."  Id. at 15, ¶ 30.  "The record is clear that the District never defined the interventions

or collected any data to assess the efficacy of the interventions, issued progress reports, or circled

back for a follow-up 90-day conference."  Id.

The school agreed to conduct a visual skills evaluation, which revealed that E.P. suffered

from a visual disability and required accommodations that included neuro-visual therapy, breaks,

and additional time for assignments.  P14 at 4 (post-examination letter from Dr. Kalicki stating,

"E.P. has significant visual deficits, which will make any near work very difficult to do").  The

school district also had E.P. evaluated for occupational therapy in early January 2018.  P-15, S-5.

The evaluation revealed concerns related to E.P.'s eyesight and recommended only that E.P. be

permitted to obtain a paper copy of information written on the white board that he was unable to

see.  S-5 at 4-5.  The evaluation included no observations of E.P. at recess, on the playground, in

the cafeteria, or on the school bus, and concluded that his below-average upper-limb

coordination skills "may be related to his visual difficulties."  Id.  Because E.P. was already

receiving vision therapy and did "not demonstrate any school-based Occupational Therapy

needs," he did not qualify for services.  Id. at 5.

Later in January 2018, E.P.'s mother again contacted his teacher about E.P.'s explosive behavior at home and anxiety over the academic all-stars program.  P4 at 29.  In internal school emails, E.P.'s teacher wrote that she was "provoked" by the emails.  S-21 at 14.  She reported to E.P.'s mother that he had "not completed the 3 of 10 assignments he chose after coming back to school" even though he had enough time to do so because "he was choosing preferred activities over his classwork, i.e. drawing and chatting with classmates."  Id. at 14-15.  She offered to have the school counselor speak with E.P.  Id.  The next month, E.P.'s teacher refused to share information with E.P.'s mother about another bullying incident based on the other students' privacy.  P4 at 30.

The school invited E.P.'s parents to participate in a meeting to discuss a 504 plan on February 26, 2018, and entered into E.P.'s first 504 Service Agreement on March 6, 2018.  S-6.  The focus of the 504 Agreement was E.P.'s visual impairment, and the accommodations were that he was permitted: 1) to offer verbal answers for tests or assignments longer than 30 mins; 2) additional time for testing/lengthy assignments; 3) to take breaks during testing; 4) to take standardized tests in a small group setting that would allow for breaks; and 5) to be seated a comfortable distance from board.  Id. at 1.  The Hearing Officer noted that, although "[t]he invitation notes a copy of the IDEA procedural safeguards is available upon request from the school . . . [t]he record is unclear if the Parents received a paper copy of the procedural safeguards."  H.O. Op. at 15 ¶ 32.

Later that month, E.P.'s mother emailed his teacher again about escalating bullying and his teacher described E.P. to the principal as "overly dramatic," although she conceded the students bullying him were "mean" and "good at getting away" with it.  P4 at 34-35.  Emails between E.P.'s mother and the school in April and May 2018 show that E.P. continued to have

social and behavioral issues at school.  P4 at 36, 39.  When E.P.'s mother followed up on

whether and how the specific accommodations in the 504 Plan were being implemented, the

principal explained why mentoring had not yet occurred, that E.P. was asking and being

permitted to "sit away from the class during morning meeting," and that any concerns about

anxiety "would need to be addressed through professional counseling" because "we don't see

much in the form of anxiety at school."  Id. at 37-38.  Internal emails show neither the principal

nor E.P.'s teacher knew what accommodation E.P.'s mother was referring to, and that they did

not ask her for clarification or try to figure it out on their own.  Id. at 37.

Less than a month after the principal dismissed the concerns about E.P.'s anxiety as not

affecting his behavior at school, E.P.'s mother emailed about an incident in which E.P. had

visited the nurse's office.  Id. at 40.  The principal emailed her that E.P. had reported to his

teacher that he had fallen and hit his head although his teachers believed that he had in fact only

pretended to fall.  Id. at 39-40.  The principal said he therefore sat down with E.P. and explained

the importance of not making up injuries.  Id. at 39.  When E.P.'s mother forwarded resources on

trauma-informed classrooms from E.P.'s therapist, the principal responded that they were happy

to receive any information about E.P. from his therapist that she wanted to provide but that they

were already familiar with the trauma-informed classrooms literature.  Id.

In late May 2018, E.P. was evaluated by the Penn Medicine Autism clinic and found not

to have autism, although he was diagnosed with prenatal cocaine exposure and unspecified

anxiety disorder.  P16 at 10.  The clinic recommended: 1) individual therapy; 2) family therapy;

3) psychiatric medication; and 4) "monitor[ing] and address[ing] negative peer interactions" by,

e.g., separating him from bullies and monitoring his interactions to prevent bullying.  Id. at 11.

Nonetheless, E.P.'s third-grade report card was excellent, with superior "learning

behaviors" scores even as his absences rose to 17, with 6 tardies.  S18 at 6-7.

In August 2018, E.P.'s parents had him psychologically evaluated again.  S7.  His parents reported his physical aggression against them was intensifying as his physical strength was growing.  Id. at 2.  This psychologist diagnosed E.P. with autism, ADHD, and mood dysregulation, and recommended family-based therapy.  Id. at 5.  E.P.'s mother emailed the principal, school counselor, and E.P.'s teachers during September 2018 about E.P.'s ongoing challenges and the district officials agreed to another meeting.  P5 at 1, 3.

Internal emails show that a new school counselor attended E.P.'s 504 meeting for the first time in October 2018.  P5. at 6.  When the new counselor inquired whether the school district had ever evaluated E.P. before, he was informed that they had not, even though "Mom and Dad requested it."  Id. at 5.  The long-time counselor explained to her new counterpart that, "at the time [] everything at school was fine for him.  Recently he has been struggling with some social situations and bus interactions in addition to what is happening at home."  Id.  The new school counselor instructed immediately that E.P. "need[ed] to be evaluated."  Id.

Although the October 2018 504 Plan still purported to address only E.P.'s vision impairment, it referenced his tendency to get "overwhelmed and stressed when he is overstimulated by his environment," as well as his struggle to understand social interactions "in an age appropriate manner."  S8 at 1.  It included two new accommodations: (1) weekly social skills support from the school counselor; and (2) no time limits on rotating station activities.  Id. The Hearing Officer observed that "[t]he record is unclear what new impairment the accommodations were targeting," H.O. Op. at 17, ¶ 36, and that "[t]he Section 504 Agreement did not address the Parent's chief concern of meltdowns related to the completion of homework after school," id. at 18, ¶ 37.

Shortly after this revised 504 Plan was put in place, E.P. was given a multi-disciplinary evaluation for behavioral reasons and an occupational therapy evaluation, but not a psychological evaluation.  S10.  Although E.P.'s mother reported multiple areas of concern in great detail, the evaluation completed by school district employees noted only that social skills were an "area of concern" by checking off a single box, and a notation that "on some assignments he may need a little extra time to complete work."  Id. at 9.

The following week, E.P. was admitted for partial hospitalization at the Childrens Hospital of Reading (CHOR).  S9.  Although E.P.'s mother emailed his teacher and principal about obtaining schoolwork so that E.P. would not be behind on his return, it was not provided. P5 at 8.  At CHOR, E.P. "attribute[d] all his behavioral symptoms [to] the bullying back at school."  S9 at 3.  He exhibited depression and anxiety, and his medications were adjusted.  S9 at 4-5.  Notes from his group therapy sessions at CHOR documented E.P.'s limited social skills. P19 at 1-2.

When E.P. returned to school in early November, his mother reached out repeatedly to counselors and teachers to ensure a smooth transition.  P5 at 9-13.  His accommodations were not scrupulously enforced.  P5 at 13 (response to mother's email sent four days earlier explaining that E.P. was only sometimes receiving his language arts accommodations and was eating popcorn instead of the high-protein snack she had provided in the afternoons).  He continued to display somatization, i.e. visiting the nurse to complain of stress-induced headaches.  P5 at 12. When E.P.'s mother emailed the school counselor that E.P. was refusing to attend school, the counselor emailed the principal, complaining that "[e]very day it is something."  P5 at 14. Nonetheless, after he was hospitalized, the school agreed to evaluate E.P.'s social/emotional/behavioral strengths and weaknesses.  S13 at 1.

As part of this evaluation, the school psychologist surveyed E.P.'s teachers and the school counselor to assess his behavioral/social skills.  P5 at 16.  The school counselor wrote to the school psychologist that often E.P.'s "perception of his situations with adults and kids is not as it plays out in reality."  Id.  She forwarded one example of this kind of interaction between E.P. and a teacher and offered to forward others, but the school psychologist declined, stating she would include information about his attendance record instead.  Id. at 18.  E.P.'s gym teacher preluded her comments to the school psychologist by noting that she had not seen E.P. that much because of his absences, but that he had "been doing a fine job in PE," although he sometimes didn't work "to his full potential" and "might sit down during an activity or take a break."  Id. at 20.  The school psychologist described this input as "good" because it allowed her to "make a disclaimer about him being absent for all the teacher input."  Id.

E.P.'s art teacher wrote that the quality of his work was "very strong," and his classroom teacher wrote that he had caught up on the work he missed and "interact[ed] with peers and adults appropriately."  P5 at 21, 26.  The school psychologist concluded that "E.P. does not show any emotional problems in school," but recommended that he let an adult know if something is bothering him and that he be allowed to work in a quiet place if necessary.  P5 at 26.

E.P.'s December 2018 Evaluation Report listed no weaknesses by his classroom or gifted teachers, and the school psychologist determined he performed better than his peers based on one half-hour observation of him as compared with another boy sitting at his table.  S11 at 3-4.  The report mentioned nothing about somatization or bullying.  P5 at 30.  Once again, the behavioral assessment scores by E.P.'s parents diverged widely from those of his teachers.  S11 at 11.  The school staff's only behavioral suggestion was that he learn to better express his feelings to adults. Id. at 14.  Based on the wide divergence of behavioral observations from his parents and school

staff, the December 2018 Evaluation Report concluded the multidisciplinary team needed more information "to identify appropriate supports for E.P. in school."  Id.  E.P.'s family therapist attended the December 2018 meeting at which this Evaluation Report was discussed.  Id. at 16.

On January 4, 2019, E.P.'s mother emailed the school about ongoing meltdowns at home, and requested reduced or different homework.  P5 at 35-36.  The teacher responded that she would consult with the team, but noted that E.P. "has been completing all the work assigned and has been on task" at school.  Id. at 35.  Five days later, E.P.'s mother emailed that he needed additional time to complete a homework packet, and his teacher emailed his team noting that, "[t]he packet was for homework and he has had 6 nights to complete.  I know there is stuff going on at home so I want to be flexible but like I said I just want to make sure too he takes responsibility for work."  Id. at 37.

That month, E.P. was re-evaluated for OT and once again did not qualify for services.  P23 at 5.  About a week afterwards, his parents requested another 504 meeting to discuss new concerns regarding social conflicts on the school bus.  S12 at 1; P5 at 41.  E.P.'s mother emailed the school again in early February to follow up on accommodations that did not appear to have been implemented as well as the bus problem, and to report additional interpersonal conflicts causing E.P. distress.  P5 at 42-49.  His interpersonal conflicts included disputes with the librarian, a substitute teacher, and his home therapists.  Id.  These conflicts had led to him refusing to attend school multiple times.  Id.  The school counselor forwarded one of the emails to the principal, asking if he wanted to "handle it because it is an attendance issue."  Id. at 53.

In mid-February 2019, Twin Valley issued another evaluation report, the follow-up to the December 2018 Evaluation Report.  S13.  The report states that it sought to determine: (1) E.P.'s social/emotional/behavioral strengths and needs; (2) whether E.P. met the educational disability

classification of autism; and (3) what supports E.P. required in school.  Id. at 1.  Although the
school had scheduled another classroom evaluation, it never took place because E.P. was absent
that day, so instead it relied on the same half-hour observation from the December 2018
evaluation.  Id. at 4.  The school psychologist also included the classroom teacher's report of two
incidents from early December 2018, when E.P. appeared to struggle with math assigned in class
and at home.  Id.

The new report included a recent speech-language evaluation, which found normal scores
on all standardized testing, and concerns from his mother about the content of E.P.'s
conversations with his peers and his limited ability to identify and articulate his emotions.  Id. at
13.  The evaluation concluded that E.P. did not suffer from a speech-language impairment and
did not require speech-language therapy.  Id.  The new report also included the results of a
January 2019 occupational therapy assessment.  Id.  This assessment found that, with the help of
his new bifocals, E.P.'s gross motor, fine motor, and sensory processing skills were all normal.
Id. at 14-15.  He did not qualify for services.  Id. at 15.

In the behavioral assessment portion, E.P. was evaluated by his classroom teacher, music
teacher, his mother and, in part, himself.  Id. at 17-23.  Once again, E.P.'s parents and teachers
provided drastically different observations.  Id. at 17, 21-22.  In the portions of the assessment
where E.P. rated his own experiences, his ratings largely aligned with his mother's.  Id. at 18, 23.
Nonetheless, the report concluded E.P. did not qualify for a Positive Behavior Support Plan and
that he did not require specially designed instruction.  Id. at 27.  Instead, "E.P.'s needs [could] be
met through accommodations in a 504 Service Agreement."  Id. at 28.  The recommendations
were for the school to: (1) continue consulting with E.P.'s parents and interagency team; (2)
continue monitoring E.P.'s behavior at school; and (3) revise his 504 Agreement to

accommodate E.P.'s anxiety/depression.  Id.  The Hearing Officer noted that E.P.'s team "did not make any conclusions about the long history of behavioral health/mental health impairments dating back to 2016."  H.O. Op. at 23, ¶ 56.

Through the end of February and beginning of March 2019, E.P. was absent regularly, and his mother explained the basis was severe behaviors like locking himself in his room such that the door had to be taken off the hinges, as well as expressing paranoia and suicidal ideation. P24 at 54-55; S21 at 18.  In March, E.P. refused to complete his homework.  P5 at 60.  When he was kept inside during recess to do so, E.P.'s mother reminded his teacher that his 504 Plan required activity breaks like recess.  Id. at 57-58.  When E.P.'s teacher asked the principal how she should respond to this criticism, the principal instructed her to tell E.P.'s mother that E.P. had gone outside for recess "as normal," but the recess itself was shortened due to temperature and winds.  Id. at 57.

At a meeting on March 8, 2019 with E.P.'s school-based team, mother, two family therapists, and adoption counselor, the school district's proposed 504 Service Agreement included new accommodations: (1) regular check-ins with the school counselor; (2) opportunities for brainstem-based sensory activities throughout the day; and (3) the opportunity to complete homework during the school day.  S14 at 1-2.  Nonetheless, E.P.'s mother did not agree to the plan, noting that she agreed he was "in need of services," but that the "services outlined do[] not provide FAPE."  Id. at 4.  The Hearing Officer noted that, this "Section 504 Agreement did not address the Student's behavioral dysregulation connected to homework."  H.O. Op. at 24, ¶ 57.

Internal discussions about E.P.'s failure to complete homework continued throughout March 2019 without resolution.  P5 at 60.  E.P. continued to refuse to attend school in the spring of 2019, and during that time period the school issued a truancy letter.  P5, S15 at 1-2, S16 at 1-

3.  By the end of his fourth-grade year, E.P.'s parents had separated.  S19 at 1.  In preparation for the change to middle school for fifth grade, E.P. toured the new school, and his counselor and teacher monitored his behavior and comfort level during the tour.  P5 at 63.  E.P. was excused from certain end-of-year activities by the principal.  Id. at 66.  The Hearing Officer noted that, "sometime in the Spring of 2019, the Parents requested, and the District agreed to fund, an Independent Educational Evaluation (IEE) IDEA evaluation."  H.O. Op. at 24, ¶ 59.

The IEE was completed in June 2019, based on a one-hour classroom observation by Twin Valley's school psychologist, the testing from his many prior evaluations, new testing, E.P.'s self-report, and reports from his mother and teachers.  Once again, the observations of the adults in E.P.'s life differed dramatically.  S19.  His classroom teacher reported no concerns at all, stating that, "[a]t lunch and recess, E.P. is observed to be very social with his peers," and that "emotional issues are not observed to impact E.P.'s performance in class."  Id. at 6.  His gifted teacher reported that she had not seen his disabilities impact him "in any way in her small-group setting," and the school psychologist observed no instances of emotional distress during the hour-long observation, noting that his concentration and focus were actually better than the peer to which he was compared during class time, and that he interacted appropriately with two small groups of girls during an indoor recess.  Id. at 6-7.

Testing of his memory and concentration was largely normal except for a "borderline" finding on some data suggesting "issues with focused/selective attention and impulsivity."  Id. at 16.  The social-emotional evaluation was based on rating scales completed by E.P.'s teachers and mother, which again appeared to be describing different children.  Id. at 22.  The only abnormal rating from E.P.'s teachers came from his gifted teacher, who rated his somatization as "clinically significant."  Id.  The neuropsychologist concluded it was "not diagnostically possible

to reach a conclusion when such disparate behaviors are shown across settings," although she conceded that he continued to meet criteria for a 504 Service Agreement, and that his 504 Plan should address his transition to middle school, his "social emotional health," and school absences.  Id. at 29.  The neuropsychologist noted that "asynchronous development" in gifted children can lead to social-emotional challenges, and recommended his multi-disciplinary team "stay in tune with his needs and help shape a strong framework for social-emotional health" as part of his 504 Plan.  Id.  By referencing multiple times the obvious disabilities that would need to be addressed in E.P.'s 504 Plan but failing to include any recommendations as to how, the neuropsychologist signaled that this evaluation was limited in scope to IDEA services.

The Hearing Officer observed that "[t]he IEE examiner did not opine, gauge, or contradict any of the previous mental health or behavioral health impairments in the private evaluations.  The IEE examiner did not reach any conclusions if the Student's long history of multiple impairments substantially limited any of the Student's major life functions."  H.O. Op. at 26 ¶ 66.

E.P.'s fourth-grade report card was notably worse than the prior years' reports, with significantly diminished grades in "learning behaviors" and a reported 58 absences and 15 tardies.  P26.  After Twin Valley refused to offer additional supports and services in August 2019, E.P.'s parents' attorney requested a due process hearing in October 2019.  S10.

In his final fact-finding paragraph, the Hearing Officer acknowledged that "[t]hroughout first through fourth grade," E.P. "was able to attain grade-level expectations and pass all classes."  H.O. Op. at 26 ¶ 68.  Nonetheless, E.P. "had multiple meltdowns at home, had difficulties relating to social interactions, homework completion issues, peer-to-peer conflicts and teacher mistrust issues."  Id. at 26-27.

**DISCUSSION**

<u>Section 504: Child Find and FAPE</u>

Twin Valley contends the Hearing Officer found in favor of E.P. because he applied the wrong legal standard.  Pl. Br. (doc. 11) at 9.  It claims that the Hearing Officer never referenced the simple three-step analysis required for all Section 504 claims: (1) is the student disabled; (2) is the student otherwise qualified to participate in the activit(ies) from which he or she was excluded; and (3) was the student excluded, denied benefits, or subject to discrimination, at the school.  <u>Id.</u> at 7 (citing <u>S.H. ex rel. Durrell v. Lower Merion Sch. Dist.</u>, 729 F.3d 248, 260 (3d Cir. 2013)).  Twin Valley's position has remained consistent throughout E.P.'s elementary career: his impairments created no legal obligations on its part because his parents failed to prove that he was "excluded from participation in, denied the benefits of, or subject to discrimination at school."  Pl. Br. at 9.  Although Twin Valley acknowledges that it did not evaluate E.P.'s eligibility for benefits under Section 504 during the kindergarten assessment that set up his programming for the rest of his elementary school tenure, it denies any  liability for this failure because "there is no evidence that [E.P.] needed accommodations to access the regular school services" from kindergarten through third grade.  <u>Id.</u>

It fails to note, however, that "[f]ailure to provide a FAPE . . .  violates [Section 504] because it deprives disabled students of a benefit that non-disabled students receive simply by attending school in the normal course—a free, appropriate public education."  <u>CG v. Pennsylvania Dep't of Educ.</u>, 734 F.3d 229, 235 (3d Cir. 2013).  Although Twin Valley sets forth multiple legal arguments, this dispute comes down to a familiar issue: whether the student was provided FAPE.  Regardless whether I defer to the Hearing Officer or make de novo factual determinations, my conclusion is the same.  Because the record is clear that E.P. was repeatedly

denied reasonable accommodations like homework adjustments, he was not offered FAPE.

The Hearing Officer determined that "the District denied the student a Section 504 FAPE by under identifying the areas in need of an accommodation." H.O. Op. at 54.[2]  My review of the administrative record leads to the same conclusion.  The Hearing Officer accurately noted that, just a few weeks into elementary school "the mother wrote to the kindergarten teacher, informing her that the Student had a very difficult time with homework." Id. at 5 ¶ 5.  The Hearing Officer found, and the record shows, that E.P.'s mother made the school aware of the "emotional dysregulation" caused by homework and other school-related stress. Id.  Further, from the very beginning of E.P.'s school attendance, his teachers were notified of his eating issues, including his need for an additional protein-based snack at the end of the day to regulate his afternoon behavior.  P1 at 1 (9/8/2014 email from E.P.'s mother to Kindergarten teacher asking for help getting him to eat protein at lunch), 3 (9/24/2014 email from E.P.'s mother to Kindergarten teacher asking the teacher to give him another cheese stick at the end of the day).  Even the district's own kindergarten Re-evaluation Report denying him services going forward recognized E.P.'s need for assistance with his eating and sensory issues.  S2 at 21 (denying school-based OT while recommending monitoring during lunch and additional "heavy work").

Twin Valley's argument, that it was not required to adjust E.P.'s academic program even though its standard program was causing E.P. substantial emotional and behavioral dysregulation outside of school, conflicts with the definition of "impairment" in the regulations.  As Twin Valley notes, Section 504 is an anti-discrimination statute, and it is enforced consistently with the Americans with Disabilities Act (ADA) and its regulations.  See, e.g., 28 C.F.R. §

---

[2]    To the extent that I must defer to the Hearing Officer's conclusions under the modified de novo standard of review, the factual determinations in ¶¶ 5, 8, and 9 are supported by a preponderance of the evidence in the record.

35.108(a)(2)(i) (ensuring that the Section 504 definition of disability is construed "to the maximum extent permitted by the terms of the ADA"); Questions and Answers on the ADA Amendments Act of 2008 for Students with Disabilities Attending Public Elementary and Secondary Schools (OCR 2012) p. 2 ("All persons covered by Section 504 or Title II [of the ADA] are protected from discrimination under the general nondiscrimination regulatory provisions implementing these statutes").  Those regulations define an "impairment" as any physiological, mental, or psychological condition that "substantially limits one or more of the major life activities."  28 C.F.R. § 35.108(a)(1)(i).  "Eating" is one of those activities, as is "interacting with others."  Id. § 35.108(c)(1)(ii).

Department of Education guidance specifies that schools must evaluate students based on more than their cognitive abilities.

> Q: Is learning the only major life activity that a school district must consider in determining if a student has a disability under Section 504 and Title II?

> A: No. A student has a disability under Section 504 and Title II if a major life activity is substantially limited by his or her impairment. Nothing in the ADA or Section 504 limits coverage or protection to those whose impairments concern learning. Learning is just one of a number of major life activities that should be considered in determining whether a student has a disability within the meaning of those laws.

> Questions and Answers on the ADA Amendments Act of 2008 for Students with Disabilities Attending Public Elementary and Secondary Schools (OCR 2012), p. 6 (citing 28 C.F.R. § 35.104; 34 C.F.R. § 104.3(j)(2)(ii)).

Twin Valley notes that in E.P.'s kindergarten evaluation his teacher had "no current concerns."  Pl. Br. at 10 (citing S2 at 6).  The evaluation appears to have been adequate to determine that E.P. did not require the kind of "specially-designed instruction" required under IDEA.  H.O. Op. at 6 ¶ 9.   Section 504 regulations require more.

 "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures."  28 C.F.R. §

35.108.  "Mitigating measures" include medication, learned behavioral or adaptive neurological modifications, psychotherapy, behavioral therapy, and physical therapy.  28 C.F.R. § 35.108(d)(4).  As the Hearing Officer explained, "[t]his means that a student who succeeds academically through additional time and effort or through the use of compensatory strategies may still have a disability."  H.O. Op. at 33-34 (citing 81 Fed. Reg. 52,236 (2016)).

E.P.'s parents were open about the extent to which he relied on psychological and behavioral services to function at school.  See, e.g., P1.  Nowhere in the IDEA evaluation undertaken during E.P.'s kindergarten year did any of the professionals involved attempt to assess the effects those services were having on his learning and behavior at school.  "The evidence is preponderant that no one on the team ever considered if the Student's high cognitive ability and self-taught, yet undeveloped self-regulation strategies were acting as mitigating strategies within the meaning of Section 504."  H.O. Op. at 51.  Instead, "[t]he District did not offer and the Parents did not ask for an individual assessment to determine if the Student was otherwise eligible for Section 504 FAPE supports."  Id. at 6 ¶ 9.

Section 504's "Child Find" provision required Twin Valley to make this offer.  Culley v. Cumberland Valley Sch. Dist., 758 F. App'x 301, 306 (3d Cir. 2018).  "School districts have a continuing obligation under the IDEA and § 504 to identify and evaluate all students who are reasonably suspected of having a disability under the statutes."  P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist., 585 F.3d 727, 738 (3d Cir. 2009).  Although "Child Find does not demand that schools conduct a formal evaluation of every struggling student," it does require them "to identify and evaluate all students who are reasonably suspected of having a disability under the statutes."  D.K. v. Abington Sch. Dist., 696 F.3d 233, 249 (3d Cir. 2012).  A school's Section 504 Child Find obligations exist independently from its Child Find obligations under

IDEA.  Culley, 758 F. App'x at 306.

Twin Valley's defense essentially approaches the Section 504 analysis backwards, It reasons that, because E.P.'s teachers regarded him as a successful student, he did not require specially-designed instruction, and because he did not require specially-designed instruction, he was ineligible for benefits under Section 504.  Pl. Br. at 9, 18-19.[3]  That analysis is legally flawed. See Culley, 758 F. App'x at 306.  Twin Valley was required to undertake a Section 504 assessment once it received "warning signs" that E.P. might suffer from a qualifying impairment, and "[t]hat obligation was in play even if his" condition did not directly compromise his academic performance.  Id. at 307.  By agreeing to provide him extra cheese sticks, additional "heavy work," and check on him at lunch, but failing to offer a full Section 504 evaluation, Twin Valley deployed the type of "ad hoc accommodations" that are insufficient under Section 504's Child Find provision.  Id. at 306 (finding school district liable for failing to perform full Section 504 assessment of student with Crohn's disease even though there was no proof his absences and disciplinary issues were caused by his Crohn's disease).  E.P.'s mother clearly and consistently identified his qualifying impairment to the school, as well as the reasonable accommodations that would have helped him access a FAPE.  Twin Valley not only ignored "warning signs," it ignored fully developed independent assessments and reasonable accommodation requests.

Twin Valley claims that Section 504 accommodations are necessarily more limited than those available under IDEA and cautions that "courts must 'be mindful of the need to strike a

---

[3]      In its statute of limitations discussion, Twin Valley concedes that a proper Section 504 assessment should address if a student's impairment affects a "major life activity."  Pl. Br. at 19. In its FAPE discussion, and in the 2014 assessment, however, it assessed only whether E.P.'s impairment met a "school-based disability classification" and demonstrated "the continued need for special education services."  S2 at 1; Pl. Br. at 9.  Twin Valley, not the Hearing Officer, applied the wrong legal standard.

balance between the rights of the student and his parents and the legitimate financial and administrative concerns of the school district.'"  Pl. Br. at 8 (citing Ridley Sch. Dist. v. M.R., 680 F.3d 260, 280 (3d Cir. 2012)).  But Twin Valley's options were not limited to either funding all of E.P.'s counseling and therapies or pretending that he did not suffer from an impairment. His mother's repeated requests that the school follow recommendations from his therapists and counselors, e.g., letting him complete his first-grade homework in school, were clearly reasonable Section 504 accommodations that could potentially have allowed E.P. to benefit from the regular academic program without exacerbating his neurological and psychological conditions.  P2 at 1 (email from E.P.'s mother to first-grade teacher noting that E.P.'s therapist recommended he complete his homework in school); see also Parent and Educator Resource Guide to Section 504 (OCR December 2016) at p. 24 (allowing a student to turn in homework late is an example of a Section 504 accommodation that could be implemented by a regular classroom teacher).[4]

Twin Valley incorrectly states that "[t]hroughout [E.P.'s] Kindergarten through third grade years, there is no evidence that [E.P.] needed accommodations to access the regular school services."  Pl. Br. at 9.  E.P. was receiving accommodations at the time he was assessed in kindergarten.  S2 at 19-20 (in kindergarten, E.P. received additional gross motor activity during the school day and after school as well as monitoring during lunch).  Further, his mother repeatedly warned teachers of his problem completing homework that was assigned as part of the regular academic program.  See, e.g., P1 at 4-5, P3 at 3, S21 at 5, and P4 at 29.

---

[4]      The district's initial reluctance to credit E.P.'s parents' reports when they differed so greatly from the behavior observed by his teachers was understandable, but its refusal to acknowledge parental reports once they were also documented by independent therapists, caseworkers, and other providers is bewildering.  P2 at 5-6 (post-adoption social worker came to first grade GIEP meeting, spoke with first grade teacher directly via telephone).

Twin Valley argues that, because the private December 2016 psychiatric evaluation included no school-related recommendations and stated that E.P. "ha[d] been doing well in school academically" and had "no behavioral issues at school," it shows that he required no accommodations at that time.  Pl. Br. at 10.  This contention ignores the evaluation's statements that E.P. had difficulty getting along with peers and could identify only one friend, and the fact that the evaluation was developed for medical care, not school accommodations.  S3 at 3-4. Twin Valley similarly takes the August 2018 psychological evaluation out of context, ignoring the information about E.P.'s "deficits in developing, maintaining, and understanding relationships," as well as his report to the examining psychologist that he "d[id]n't like school at all because of the teachers" and had only "one friend in school" who was several years younger than him.  S7 at 3.  Notably, E.P. was diagnosed with autism at that evaluation, although the diagnosis was later challenged by other practitioners.  Id. at 5.

Twin Valley's summary of E.P.'s kindergarten through third-grade experience lacks support in the administrative record and contradicts the Hearing Officer's well-supported conclusions.  Twin Valley maintains that E.P. was "regulat[ing] his emotions in school," which is accurate to the extent that he was not acting out and disrupting the classroom.  Pl. Br. at 10. As the many independent evaluations show, however, and as his parents, therapists, and family counselors kept telling his teachers, he was not actually "regulating his emotions in school." Rather, he was simply not directly expressing his dysregulation to his teachers, causing both physical symptoms in school and an even greater level of dysregulation at home.  See, e.g., P1 at 1-3, P2 at 10, P3 at 1, 8, S21 at 5.  His regular school attendance from kindergarten through third

grade[5] is not evidence that his impairments were not affecting his attendance because his mother

regularly let his teachers know that his absences were caused by the same psychological "melt-

downs" she kept asking them to accommodate.  Pl. Br. at 10, P1 at 4-5, P3 at 3, S21 at 5, and P4

at 29.

Finally, Twin Valley argues the Hearing Officer failed to demonstrate that E.P. suffered

any substantive, as opposed to procedural, harm from its failure to provide FAPE.[6]  Def. Reply

(doc. 16) at 5.  I disagree.  The Hearing Officer summarized that:

> [T]he Student first stumbled over the competing homework dysregulation hurdle.
> The dysregulation stumbles then contributed to a pattern of extreme meltdowns,
> which in turn led to the emerging peer-to-peer social interaction troubles.  The
> record is clear, due to an awkward communication style and smoldering
> dysregulation, the students on the bus no longer wanted to interact with the
> Student.  That awkward style allowed others to make fun of the Student's race.
> This consistent dysregulation and pattern of negative teacher and peer social
> interactions overtaxed the Student's giftedness and emerging self-regulation
> mitigating capabilities.  This death by a thousand cuts then lead the Student to be
> hospitalized, and otherwise isolated, away from home for 20 days.  Despite the
> introduction of additional mitigating measures like in-home counseling and
> behavioral supports, the Student was not able to find a different path back to
> consistent self-regulation.

---

[5]     This evidence is not entirely factual accurate, either.  Although E.P. had 8.5 total
absences in kindergarten and 7.5 total absences in first grade, which his teacher testified is within
or close to the average range, he effectively doubled that amount in second grade, when he
missed 15.5 days of school, and in third grade, when he missed 17.6 days of school.  S18.

[6]     Twin Valley also suggests that the Hearing Officer criticized its reliance on the private
evaluations E.P.'s parents provided for E.P.'s Section 504 evaluation.  Def. Reply at 8.  He did
not.  Instead, he criticized the school district's limiting its assessment of those evaluations to
IDEA, rather than Section 504, eligibility standards.  H.O. Op. at 52-53.  Twin Valley also
suggests that the new "After-School Collapse" diagnosis undermines E.P.'s claim based on prior
diagnoses.  Def. Reply at 8.  E.P. disputes the school district's assertion that this diagnosis is
new.  Pl. Reply at 11.  Because the symptoms of this syndrome were identified to the school
multiple times throughout E.P.'s elementary school career, the diagnosis' name does not matter.
P1 at 1-3, P2 at 10, P3 at 1, 8, S21 at 5.  Finally, Twin Valley suggests that E.P. is not as
successful at his private school as his parents contend.  Def. Reply at 9.  This also does not affect
whether E.P.'s impairments were reasonably accommodated to allow him access to FAPE at
Twin Valley.

H.O. Op. at 50.  Unlike his peers who did not suffer from the same impairments, E.P.'s exposure to the standard classroom without adequate accommodation exacerbated his conditions and led to a spiral of worsening outcomes, as the Hearing Officer noted.  This constitutes substantive harm.  Instead of providing reasonable accommodations to address the problem, Twin Valley denied its obligation to provide accommodations to E.P. because he did not meet IDEA standards, even though his impairments met the Section 504 standard by substantially affecting at least one major life function.  This was a procedural violation.  Thus, the Hearing Officer demonstrated that Twin Valley's actions constituted both procedural and substantive violations.  Like the Hearing Officer, I find the district violated its Section 504 Child Find duty to E.P. beginning in kindergarten and denied him access to FAPE throughout elementary school, requiring that I find for E.P. even if the more difficult de novo review standard is applied.[7]

Statute of Limitations

Section 504 claims are subject to the same two-year statute of limitations as IDEA

---

[7]     The preponderance of the evidence shows E.P. was denied FAPE throughout elementary school regardless if the Hearing Officer's Opinion is reviewed under de novo or modified de novo standards.  To the extent that modified de novo review is required, the Hearing Officer's conclusions in ¶¶ 10, 11, and 13 support his finding that E.P. was not provided FAPE during first grade.  First grade was when E.P.'s mother brought their adoption social worker to E.P.'s GIEP meeting, and let the school know that the specific homework accommodations she was requesting came from E.P.'s therapist.  P2 at 1, 5-6.  First grade is also when E.P.'s teacher recommended that the school not set the "dangerous precedence" of providing accommodations for E.P., even though the school counselor had suggested that "a behavioral issue affecting academics" requires an IEP.  Id. at 1-2.  The Hearing Officer's conclusions in ¶¶ 17-20 support his finding that E.P. was not provided FAPE during second grade.  That evidence shows that E.P.'s mother let his teacher know about E.P.'s ongoing meltdowns, school-related anxiety, social challenges, and somatization, as well as the growing evidence that these challenges were beginning to affect his academic progress.  P3.  The Hearing Officer's accurate factual summaries in ¶¶ 26-32 support his conclusion that the district continued to violate its Section 504 obligations even after E.P.'s parents provided evidence of his impairment and a written request for evaluation in third grade.  The Hearing Officer's accurate factual summaries in ¶¶ 34-37, 55-57, 65-68, support his determination that the district continued to provide inadequate support even after it acknowledged owing Section 504 accommodations to E.P. during fourth grade.

claims.  P.P., 585 F.3d at 729.  The limitation period begins to run on the "discovery date," i.e.
when a student's parents knew or should have known that the District's action or inaction
violated their child's legal rights.  G.L. v. Ligonier Valley Sch. Dist. Auth., 802 F.3d 601, 606
(3d Cir. 2015).  The "touchstone" of the discovery rule is "reasonable diligence."  Vitalo v.
Cabot Corp., 399 F.3d 536, 538–39 (3d Cir. 2005).  This means that, even if a parent does not
know of a legal injury, he or she "should have known" of the injury if "reasonable diligence"
would have revealed its existence by that date.  Id.  To the extent that a parent waits more than
two years from that date to file a complaint, his or her claims are limited to damages that arose
within the prior two years.  G.L., 802 F.3d at 611.  For timely filed claims, however, "this
limitations period functions in a traditional way, that is, as a filing deadline that runs from the
date of reasonable discovery and not as a cap on a child's remedy for timely-filed claims that
happen to date back more than two years before the complaint is filed."  Id. at 616.

The Hearing Officer found the operative date for E.P.'s claim was October 10, 2018,
because it was: (1) the date Twin Valley offered a Section 504 Agreement for the first time; (2)
the date Twin Valley provided E.P.'s parents their procedural safeguards for the first time; and
(3) the date that "the Parents possessed sufficient critical facts to understand the scope of the
Student's undiscovered and otherwise hidden impairments."  H.O. Op. at 46.

Twin Valley argues E.P.'s parents knew or should have known of the claim as of October
27, 2017, when they notified the principal in a formal letter that his needs were not being
accommodated.  Pl. Br. at 15.  It argues that, as of this date, E.P.'s parents knew: (1) Twin
Valley had found E.P. had no disability; (2) his disabilities were not being adequately addressed;
(3) Twin Valley had declined to further evaluate E.P.; (4) "how to obtain procedural safeguards";
and (5) the names of several disability-rights advocacy organizations.  Id. at 16.  It also points

out that the Hearing Officer's assertion that October 10, 2018 was the first date the school

district offered a Section 504 Agreement is inaccurate, because it first offered a Section 504

Agreement to accommodate E.P.'s vision impairment on March 6, 2018.  Id.

Twin Valley accurately identified a factual error: the date of E.P.'s first Section 504

Agreement is March 6, 2018.  S6.  Even if the operative date is moved to this earlier date,

however, E.P.'s suit is timely filed.  Def. Br. at 4 (parents filed due process complaint 10/29/19).

Thus, this error is harmless to the statute of limitations analysis.

Twin Valley argues its failure to provide a copy of the procedural safeguards is irrelevant

to the date when the statute of limitations began.  Def. Reply at 7.  I disagree.  Section 504

requires "a system of procedural safeguards that includes notice, an opportunity for the parents

or guardian of the person to examine relevant records, an impartial hearing with opportunity for

participation by the person's parents or guardian and representation by counsel, and a review

procedure."  34 C.F.R. § 104.36.  The same regulations that set forth the limitations period state

that "withholding of information from the parent that was required under this part to be provided

to the parent" exempts the parent from that limitations period if it prevented the parent from

filing a due process claim.  34 C.F.R. § 300.511(f)(1).

The 2017 letter date proposed by Twin Valley cannot be the operative date because it is

when the parents formally requested a Section 504 Agreement for the first time.  At that time,

Twin Valley had never provided E.P.'s parents with a copy of the notice letting them know they

could even file a due process complaint.  It would be inequitable and contravene the

implementing regulations to find they should have filed suit instead of, or in addition to, sending

that letter.  Id.

Further, E.P.'s parents did not know what accommodations Twin Valley would

recommend on the day they sent their letter.  It would be absurd to find E.P.'s parents "knew" Twin Valley violated E.P.'s Section 504 rights before Twin Valley had had an opportunity to even propose its solution for addressing his Section 504 impairments.  See G.L., 802 F.3d at 606 (noting the operative date was the day the parents removed the student from the school, a year and a half after the family had first requested an evaluation, and four months after an inadequate IEP had been put in place).  Like the Hearing Officer, I find the operative date was the date of the first Section 504 Agreement because it was the first date they knew or should have known that Twin Valley intended to implement legally inadequate accommodations.  Because E.P.'s claim was filed within two years of that date, it is timely.

Compensatory Education

Finally, Twin Valley argues the Hearing Officer's inability to quantify the compensatory education owed for its denial of FAPE shows E.P. failed to prove a denial of FAPE.  Def. Br. at 29.  The Hearing Officer ordered Twin Valley to pay for an independent evaluator to identify "the type, frequency, intensity and quantity of compensatory education services needed to place the Student in the same position the Student would have achieved."  H.O. Op. at 58 ¶ 2.

As discussed above, Twin Valley denied E.P. access to FAPE throughout elementary school.  By structuring the compensatory education award in this way, the Hearing Officer implicitly recognized the difference between Twin Valley's obligations under IDEA and Section 504.  He could not simply add up the hours of occupational therapy or reading assistance that should have been provided because the accommodations the district failed to provide were things like the ability to do homework in school without losing recess or be excused from programs that overtaxed E.P.'s ability to emotionally regulate himself.  P2 at 1, S21 at 10, P4 at 29.  It is possible that none of the reasonable accommodations the district should have provided would

have allowed E.P. to reach his potential, but it is also possible that they would have.

E.P. argues he should be awarded compensatory education equal to "the amount of hours contained within the representative school years," i.e. at least four years of compensatory education.  Pl. Br. at 39 (citing Keystone Central Sch. Dist. v. E.E., 438 F. Supp. 2d 519, 525-26 (M.D. Pa. 2006)).  But the very "ad hoc accommodations" that failed to meet the district's legal obligations may have at least reduced the amount of compensatory education owed.  See S21 at 9 (10/27/17 letter from parents to principal notes that sensory breaks and additional protein snacks "did help when [they were] done," but because E.P. did not have an IEP, the accommodations "did not last more than a week or so").  Allowing an independent evaluator to decide how much compensatory education will put E.P. in the place he would have been in had the school district consistently met its obligations in the first place is a fair and equitable solution.  G.L., 802 F.3d at 618-19.

An appropriate Order follows.